REVISED MAY 30, 2008

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 8, 2008

Charles R. Fulbruge III
Clerk

No. 06-30745

KADLEC MEDICAL CENTER; WESTERN PROFESSIONAL INSURANCE
COMPANY

Plaintiffs - Appellees - Cross-Appellants

V.

LAKEVIEW ANESTHESIA ASSOCIATES, A Professional Medical
Corporation; LAKEVIEW MEDICAL CENTER LLC, doing business as
Lakeview Regional Medical Center; DR MARK DENNIS; DR WILLIAM J
PREAU, III

Defendants - Appellants - Cross-Appellees

DR DAVID BALDONE; DR ALLAN PARR

Defendants - Cross-Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before REAVLEY, BENAVIDES, and ELROD, Circuit Judges.

REAVLEY, Circuit Judge:

Kadlec Medical Center and its insurer, Western Professional Insurance
Company, filed this diversity action in Louisiana district court against Louisiana
Anesthesia Associates (LAA), its shareholders, and Lakeview Regional Medical
Center (Lakeview Medical). The LAA shareholders worked with Dr. Robert

Berry—an anesthesiologist and former LAA shareholder—at Lakeview Medical, where the defendants discovered his on-duty use of narcotics. In referral letters written by the defendants and relied on by Kadlec, his future employer, the defendants did not disclose Dr. Berry's drug use.

While under the influence of Demerol at Kadlec, Dr. Berry's negligent performance led to the near-death of a patient, resulting in a lawsuit against Kadlec. Plaintiffs claim here that the defendants' misleading referral letters were a legal cause of plaintiffs' financial injury, i.e., having to pay over $8 million to defend and settle the lawsuit. The jury found in favor of the plaintiffs and judgment followed. We reverse the judgment against Lakeview Medical, vacate the remainder of the judgment, and remand.

## I. Factual Background

Dr. Berry was a licensed anesthesiologist in Louisiana and practiced with Drs. William Preau, Mark Dennis, David Baldone, and Allan Parr at LAA. From November 2000 until his termination on March 13, 2001, Dr. Berry was a shareholder of LAA, the exclusive provider of anesthesia services to Lakeview Medical (a Louisiana hospital).

In November 2000, a small management team at Lakeview Medical investigated Dr. Berry after nurses expressed concern about his undocumented and suspicious withdrawals of Demerol. The investigative team found excessive Demerol withdrawals by Dr. Berry and a lack of documentation for the withdrawals.

Lakeview Medical CEO Max Lauderdale discussed the team's findings with Dr. Berry and Dr. Dennis. Dr. Dennis then discussed Dr. Berry's situation with his partners. They all agreed that Dr. Berry's use of Demerol had to be controlled and monitored. But Dr. Berry did not follow the agreement or account for his continued Demerol withdrawals. Three months later, Dr. Berry failed to

2

answer a page while on-duty at Lakeview Medical. He was discovered in the call-room, asleep, groggy, and unfit to work. Personnel immediately called Dr. Dennis, who found Dr. Berry not communicating well and unable to work. Dr. Dennis had Dr. Berry taken away after Dr. Berry said that he had taken prescription medications.

Lauderdale, Lakeview Medical's CEO, decided that it was in the best interest of patient safety that Dr. Berry not practice at the hospital. Dr. Dennis and his three partners at LAA fired Dr. Berry and signed his termination letter on March 27, 2001, which explained that he was fired "for cause":

> [You have been fired for cause because] you have reported to work in an impaired physical, mental, and emotional state. Your impaired condition has prevented you from properly performing your duties and puts our patients at significant risk. . . . [P]lease consider your termination effective March 13, 2001.

At Lakeview Medical, Lauderdale ordered the Chief Nursing Officer to notify the administration if Dr. Berry returned.

Despite recognizing Dr. Berry's drug problem and the danger he posed to patients, neither Dr. Dennis nor Lauderdale reported Dr. Berry's impairment to the hospital's Medical Executive Committee, eventually noting only that Dr. Berry was "no longer employed by LAA." Neither one reported Dr. Berry's impairment to Lakeview Medical's Board of Trustees, and no one on behalf of Lakeview Medical reported Dr. Berry's impairment or discipline to the Louisiana Board of Medical Examiners or to the National Practitioner's Data Bank. In fact, at some point Lauderdale took the unusual step of locking away in his office all files, audits, plans, and notes concerning Dr. Berry and the investigation.

After leaving LAA and Lakeview Medical, Dr. Berry briefly obtained work as a locum tenens (traveling physician) at a hospital in Shreveport, Louisiana. In October 2001, he applied through Staff Care, a leading locum tenens staffing

3

firm, for locum tenens privileges at Kadlec Medical Center in Washington State. After receiving his application, Kadlec began its credentialing process. Kadlec examined a variety of materials, including referral letters from LAA and Lakeview Medical.

LAA's Dr. Preau and Dr. Dennis, two months after firing Dr. Berry for his on-the-job drug use, submitted referral letters for Dr. Berry to Staff Care, with the intention that they be provided to future employers. The letter from Dr. Dennis stated that he had worked with Dr. Berry for four years, that he was an excellent clinician, and that he would be an asset to any anesthesia service. Dr. Preau's letter said that he worked with Berry at Lakeview Medical and that he recommended him highly as an anesthesiologist. Dr. Preau's and Dr. Dennis's letters were submitted on June 3, 2001, only sixty-eight days after they fired him for using narcotics while on-duty and stating in his termination letter that Dr. Berry's behavior put "patients at significant risk."

On October 17, 2001, Kadlec sent Lakeview Medical a request for credentialing information about Berry. The request included a detailed confidential questionnaire, a delineation of privileges, and a signed consent for release of information. The interrogatories on the questionnaire asked whether "[Dr. Berry] has been subject to any disciplinary action," if "[Dr. Berry has] the ability (health status) to perform the privileges requested," whether "[Dr. Berry has] shown any signs of behavior/personality problems or impairments," and whether Dr. Berry has satisfactory "judgement."

Nine days later, Lakeview Medical responded to the requests for credentialing information about fourteen different physicians. In thirteen cases, it responded fully and completely to the request, filling out forms with all the information asked for by the requesting health care provider. The fourteenth request, from Kadlec concerning Berry, was handled differently. Instead of

4

completing the multi-part forms, Lakeview Medical staff drafted a short letter. In its entirety, it read:

> This letter is written in response to your inquiry regarding [Dr. Berry]. Due to the large volume of inquiries received in this office, the following information is provided.
>
> Our records indicate that Dr. Robert L. Berry was on the Active Medical Staff of Lakeview Regional Medical Center in the field of Anesthesiology from March 04, 1997 through September 04, 2001.
>
> If I can be of further assistance, you may contact me at (504) 867-4076.

The letter did not disclose LAA's termination of Dr. Berry; his on-duty drug use; the investigation into Dr. Berry's undocumented and suspicious withdrawals of Demerol that "violated the standard of care"; or any other negative information. The employee who drafted the letter said at trial that she just followed a form letter, which is one of many that Lakeview Medical used.

Kadlec then credentialed Dr. Berry, and he began working there. After working at Kadlec without incident for a number of months, he moved temporarily to Montana where he worked at Benefis Hospital. During his stay in Montana, he was in a car accident and suffered a back injury. Kadlec's head of anesthesiology and the credentialing department all knew of Dr. Berry's accident and back injury, but they did not investigate whether it would impair his work.

After Dr. Berry returned to Kadlec, some nurses thought that he appeared sick and exhibited mood swings. One nurse thought that Dr. Berry's entire demeanor had changed and that he should be watched closely. In mid-September 2002, Dr. Berry gave a patient too much morphine during surgery, and she had to be revived using Narcan. The neurosurgeon was irate about the incident.

5

On November 12, 2002, Dr. Berry was assigned to the operating room beginning at 6:30 a.m. He worked with three different surgeons and multiple nurses well into the afternoon. According to one nurse, Dr. Berry was "screwing up all day" and several of his patients suffered adverse affects from not being properly anesthetized. He had a hacking cough and multiple nurses thought he looked sick. During one procedure, he apparently almost passed out.

Kimberley Jones was Dr. Berry's fifth patient that morning. She was in for what should have been a routine, fifteen minute tubal ligation. When they moved her into the recovery room, one nurse noticed that her fingernails were blue, and she was not breathing. Dr. Berry failed to resuscitate her, and she is now in a permanent vegetative state.

Dr. Berry's nurse went directly to her supervisor the next morning and expressed concern that Dr. Berry had a narcotics problem. Dr. Berry later admitted to Kadlec staff that he had been diverting and using Demerol since his June car accident in Montana and that he had become addicted to Demerol. Dr. Berry wrote a confession, and he immediately admitted himself into a drug rehabilitation program.

Jones's family sued Dr. Berry and Kadlec in Washington. Dr. Berry's insurer settled the claim against him. After the Washington court ruled that Kadlec would be responsible for Dr. Berry's conduct under respondeat superior, Western, Kadlec's insurer, settled the claim against Kadlec.

## II. Procedural History

Kadlec and Western filed this suit in Louisiana district court against LAA, Dr. Dennis, Dr. Preau, Dr. Baldone, Dr. Parr, and Lakeview Medical, asserting Louisiana state law claims for intentional misrepresentation, negligent misrepresentation, strict responsibility misrepresentation, and general negligence. Plaintiffs alleged that defendants' tortious activity led to Kadlec's

6

hiring of Dr. Berry and the resulting millions of dollars it had to expend settling the Jones lawsuit. Plaintiffs' claim against LAA for negligence, based on a negligent monitoring and investigation theory, was dismissed before trial.

Plaintiffs' surviving claims for intentional and negligent misrepresentation arise out of the alleged misrepresentations in, and omissions from, the defendants' referral letters for Dr. Berry. These claims were tried to a jury, which returned a verdict in favor of the plaintiffs on both claims. The jury awarded plaintiffs $8.24 million, which is approximately equivalent to the amount Western spent settling the Jones lawsuit ($7.5 million) plus the amount it spent on attorneys fees, costs, and expenses (approximately $744,000) associated with the Jones lawsuit. The jury also found Kadlec and Dr. Berry negligent. The jury apportioned fault as follows: Dr. Dennis 20%; Dr. Preau 5%; Lakeview Medical 25%; Kadlec 17%; and Dr. Berry 33%. The judgments against Dr. Dennis and Dr. Preau were in solido with LAA. Because defendants were found liable for intentional misrepresentation, plaintiffs' recovery was not reduced by the percentage of fault ascribed to Kadlec.[1] But the amount was reduced to $5.52 million to account for Dr. Berry's 33% of the fault.[2] The district court entered judgment against Lakeview Medical and LAA.

### III. Discussion

#### A. The Intentional and Negligent Misrepresentation Claims

The plaintiffs allege that the defendants committed two torts: intentional misrepresentation and negligent misrepresentation.[3] The elements of a claim

---

[1] LA. CIV. CODE art. 2323(C).

[2] No complaint has been made, in the district court or to this court, about allocating fault to Dr. Berry in this case.

[3] Plaintiffs contend that the defendants' torts caused them an economic loss, which is a cognizable claim in Louisiana, "a jurisdiction which allows recovery in tort for purely

7

for intentional misrepresentation in Louisiana are: (1) a misrepresentation of a material fact; (2) made with intent to deceive; and (3) causing justifiable reliance with resultant injury.[4]  To establish a claim for intentional misrepresentation when it is by silence or inaction, plaintiffs also must show that the defendant owed a duty to the plaintiff to disclose the information.[5]  To make out a negligent misrepresentation claim in Louisiana: (1) there must be a legal duty on the part of the defendant to supply correct information; (2) there must be a breach of that duty, which can occur by omission as well as by affirmative misrepresentation; and (3) the breach must have caused damages to the plaintiff based on the plaintiff's reasonable reliance on the misrepresentation.[6]

The defendants argue that any representations in, or omissions from, the referral letters cannot establish liability.  We begin our analysis below by holding that after choosing to write referral letters, the defendants assumed a duty not to make affirmative misrepresentations in the letters.  We next analyze whether the letters were misleading, and we conclude that the LAA defendants' letters were misleading, but the letter from Lakeview Medical was not.  We also examine whether the defendants had an affirmative duty to disclose negative information about Dr. Berry in their referral letters, and we conclude that there was not an affirmative duty to disclose.  Based on these holdings, Lakeview Medical did not breach any duty owed to Kadlec, and therefore the judgment

economic loss."  Barrie v. V.P. Exterminators, Inc., 625 So. 2d 1007, 1014 (La. 1993).

[4] Guidry v. United States Tobacco Co., 188 F.3d 619, 627 (5th Cir. 1999).

[5] See Greene v. Gulf Coast Bank, 593 So. 2d 630, 632 (La. 1992).

[6] Brown v. Forest Oil Corp., 29 F.3d 966, 969 (5th Cir. 1994); In re Ward, 894 F.2d 771, 776 (5th Cir. 1990); Pastor v. Lafayette Bldg. Ass'n, 567 So. 2d 793, 796 (La. Ct. App. 1990); Cypress Oilfield Contractors, Inc. v. McGoldrick Oil Co., 525 So. 2d 1157, 1162 (La. Ct. App. 1988).

against it is reversed. Finally, we examine other challenges to the LAA defendants' liability, and we conclude that they are without merit.

### 1. The Affirmative Misrepresentations

The defendants owed a duty to Kadlec to avoid affirmative misrepresentations in the referral letters. In Louisiana, "[a]lthough a party may keep absolute silence and violate no rule of law or equity, . . . if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to [disclose] the whole truth."[7] In negligent misrepresentation cases, Louisiana courts have held that even when there is no initial duty to disclose information, "once [a party] volunteer[s] information, it assume[s] a duty to insure that the information volunteered [is] correct."[8]

Consistent with these cases, the defendants had a legal duty not to make affirmative misrepresentations in their referral letters. A party does not incur liability every time it casually makes an incorrect statement. But if an employer makes a misleading statement in a referral letter about the performance of its former employee, the former employer may be liable for its statements if the facts and circumstances warrant. Here, defendants were recommending an anesthesiologist, who held the lives of patients in his hands every day. Policy considerations dictate that the defendants had a duty to avoid misrepresentations in their referral letters if they misled plaintiffs into thinking that Dr. Berry was an "excellent" anesthesiologist, when they had information

---

[7] Am. Guar. Co. v. Sunset Realty & Planting Co., 23 So. 2d 409, 455–56 (La. 1944).

[8] See, e.g., Pastor, 567 So. 2d at 796; accord Leon v. Moore, 896 So. 2d 1073, 1076 (La. Ct. App. 2004) (holding that "[t]here is no general duty to speak, but if one does speak, he may be liable for any intentional misrepresentation (fraud) or any negligent misrepresentation"); Cypress Oilfield Contractors, Inc., 525 So. 2d at 1162 (holding that although a bank did not owe a duty of disclosure to the plaintiff, a non-customer, the bank "assumed a duty to insure that the information volunteered was correct").

9

that he was a drug addict. Indeed, if defendants' statements created a misapprehension about Dr. Berry's suitability to work as an anesthesiologist, then by "volunteer[ing] to speak and to convey information which . . . influence[d] the conduct of [Kadlec], [they were] bound to [disclose] the whole truth."[9] In other words, if they created a misapprehension about Dr. Berry due to their own statements, they incurred a duty to disclose information about his drug use and for-cause firing to complete the whole picture.

We now review whether there is evidence that the defendants' letters were misleading. We start with the LAA defendants. The letter from Dr. Preau stated that Dr. Berry was an "excellent anesthesiologist" and that he "recommend[ed] him highly." Dr. Dennis's letter said that Dr. Berry was "an excellent physician" who "he is sure will be an asset to [his future employer's] anesthesia service." These letters are false on their face and materially misleading. Notably, these letters came only sixty-eight days after Drs. Dennis and Preau, on behalf of LAA, signed a letter terminating Dr. Berry for using narcotics while on-duty and stating that Dr. Berry's behavior put "patients at significant risk." Furthermore, because of the misleading statements in the letters, Dr. Dennis and Dr. Preau incurred a duty to cure these misleading statements by disclosing to Kadlec that Dr. Berry had been fired for on-the-job drug use.

The question as to whether Lakeview Medical's letter was misleading is more difficult. The letter does not comment on Dr. Berry's proficiency as an anesthesiologist, and it does not recommend him to Kadlec. Kadlec says that the letter is misleading because Lakeview Medical stated that it could not reply to Kadlec's detailed inquiry in full "[d]ue to the large volume of inquiries received."

---

[9] Sunset Realty, 23 So. 2d at 455–56.

10

But whatever the real reason that Lakeview Medical did not respond in full to Kadlec's inquiry, Kadlec did not present evidence that this could have affirmatively misled it into thinking that Dr. Berry had an unchecked history at Lakeview Medical.

Kadlec also says that the letter was misleading because it erroneously reported that Dr. Berry was on Lakeview Medical's active medical staff until September 4, 2001. Kadlec presented testimony that had it known that Dr. Berry never returned to Lakeview Medical after March 13, 2001, it would have been suspicious about the apparently large gap in his employment. While it is true that Dr. Berry did not return to Lakeview Medical after March 13, this did not terminate his privileges at the hospital, or mean that he was not on "active medical staff." In fact, it appears that Dr. Berry submitted a formal resignation letter on October 1, 2001, weeks after September 4. Therefore, while the September 4 date does not accurately reflect when Dr. Berry was no longer on Lakeview Medical's active medical staff, it did not mislead Kadlec into thinking that he had less of a gap in employment than he actually had.

In sum, we hold that the letters from the LAA defendants were affirmatively misleading, but the letter from Lakeview Medical was not. Therefore, Lakeview Medical cannot be held liable based on its alleged affirmative misrepresentations. It can only be liable if it had an affirmative duty to disclose information about Dr. Berry. We now examine the theory that, even assuming that there were no misleading statements in the referral letters, the defendants had an affirmative duty to disclose. We discuss this theory with regard to both defendants for reasons that will be clear by the end of the opinion.

### 2. The Duty to Disclose

In Louisiana, a duty to disclose does not exist absent special circumstances, such as a fiduciary or confidential relationship between the

11

parties, which, under the circumstances, justifies the imposition of the duty.[10] Louisiana cases suggest that before a duty to disclose is imposed the defendant must have had a pecuniary interest in the transaction.[11] In Louisiana, the existence of a duty is a question of law,[12] and we review the duty issue here de novo.[13]

Plaintiffs assert that Lakeview Medical and the LAA doctors had a pecuniary interest in the referral letters supplied to Kadlec. The plaintiffs rely

---

[10] See Wilson v. Mobil Oil Corp., 940 F. Supp. 944, 955 (E.D. La. 1996) (citing Greene v. Gulf Coast Bank, 593 So. 2d 630, 632 (La. 1992) and First Downtown Dev. v. Cimochowski, 613 So. 2d 671, 677 (La. Ct. App. 1993)); Bunge Corp. v. GATX Corp., 557 So. 2d 1376, 1383–84 (La. 1990).

[11] See Barrie, 625 So. 2d at 1017 ("due to V.P.'s pecuniary interest in supplying the information, the duty arose to exercise reasonable care"). In McLachlan v. New York Life Ins. Co., 488 F.3d 624 (5th Cir. 2007), relied on by the defendants, this court said in the middle of one paragraph that under Louisiana law a duty to disclose exists only where there is privity of contract or a fiduciary relationship between the parties. Id. at 628. But later in the same paragraph the court acknowledged that the Louisiana Supreme Court has imposed a duty to disclose where there was no privity or fiduciary relationship. Id. Our review of Louisiana cases confirms that there does not need to be privity of contract or a fiduciary relationship for there to be a duty to disclose. See, e.g., Barrie, 625 So. 2d. at 1014 (holding that "Louisiana is a jurisdiction which allows recovery in tort for . . . negligent misrepresentation where privity of contract is absent"). The Louisiana Supreme Court has said elsewhere that "[i]t has long been held that the duty to disclose exists" where the parties have a confidential relationship with each other, and the court explained that "[t]he confidential relationship is not restricted to any specific association of the parties," but exists between "generally all persons who are associated by any relation of trust and confidence." Bunge, 557 So. 2d at 1383–84 & n.4 (internal quotation marks omitted). Therefore, we must look carefully at the facts of this case to determine whether there was a duty to disclose. See Barrie, 625 So. 2d at 1016 ("Louisiana's case by case development of the tort of negligent misrepresentation has not been restricted to a set theory. . . . Adopting one of the common law standards as the sole method for determining liability for this tort is not necessary. The case by case application of the duty/risk analysis, presently employed by our courts, adequately protects the misinformer and the misinformed because the initial inquiry is whether, as a matter of law, a duty is owed to this particular plaintiff to protect him from this particular harm.").

[12] Bunge, 557 So. 2d at 1384.

[13] Bursztajn v. United States, 367 F.3d 485, 489 (5th Cir. 2004).

12

on the pecuniary interest definition in the Second Restatement of Torts. Section 552, comment d of the Restatement, provides (with emphasis added):

> The defendant's pecuniary interest in supplying the information will normally lie in a consideration paid to him for it or paid in a transaction in the course of and as a part of which it is supplied. It may, however, be of a more indirect character. . . .
> The fact that the information is given in the course of the defendant's business, profession or employment is a sufficient indication that he has a pecuniary interest in it, even though he receives no consideration for it at the time. It is not, however, conclusive. . . .

The "course of business" definition of pecuniary interest has been endorsed by Louisiana appellate courts. In Anderson v. Heck, the court defined the "pecuniary interest" of the defendant by directly quoting and applying the portion of the Restatement comment highlighted above.[14] The court in Dousson v. South Central Bell held that the fact that information is given in the course of a party's business or profession is a sufficient indication of pecuniary interest even though the party receives no consideration for it at the time.[15]

The defendants argue that, even assuming the Restatement governs, they did not have a pecuniary interest in providing reference information. They contend that any information provided to future employers about Dr. Berry was gratuitous, and they point out that the Restatement's comments say that a party will not be considered to have a pecuniary interest in a transaction where the information is given "purely gratuitously."[16]

The defendants have the better argument on the lack of pecuniary interest

---

[14] 554 So. 2d 695, 705 (La. Ct. App. 1989). The court also held that the "pecuniary interest" necessary to establish a duty "need not be direct or immediate." Id.

[15] 429 So. 2d 466, 468 (La. Ct. App. 1983).

[16] RESTATEMENT (SECOND) OF TORTS § 552 cmt. c.

13

and, in addition, the requisite "special relationship" between the defendants and Kadlec, necessary to impose a duty to disclose, is lacking.[17]

Plaintiffs argue that policy considerations weigh in favor of recognizing a duty to disclose. They contend that imposing a duty on health care employers to disclose that a physician's drug dependence could pose a serious threat to patient safety promotes important policy goals recognized by Louisiana courts. Plaintiffs point to the decision in Dornak v. Lafayette General Hospital, where the Louisiana Supreme Court imposed on a hospital the duty to disclose to its employee the results of a pre-employment physical which showed tuberculosis, "especially considering the fact that . . . [her] duties plac[ed] her in contact with co-employees and hospital patients."[18] The Louisiana legislature recently adopted legislation that requires health care entities to "report [to the appropriate professional licensing board] each instance in which the health care entity . . . [t]akes an adverse action against a health care professional due to impairment or possible impairment."[19] This shows that the legislature has recognized the importance of reporting possible impairments that could affect patient safety.

Despite these compelling policy arguments, we do not predict that courts in Louisiana—absent misleading statements such as those made by the LAA defendants—would impose an affirmative duty to disclose. The defendants did not have a fiduciary or contractual duty to disclose what it knew to Kadlec. And

---

[17] See Barrie, 625 So. 2d at 1016 (determining whether there is a duty to disclose must be made on a case-by-case basis); see also Wilson, 940 F. Supp. at 955; Greene, 593 So. 2d at 632; First Downtown, 613 So. 2d at 677 (all emphasizing the need to find a special relationship between the parties before imposition of a duty to disclose).

[18] 399 So. 2d 168, 170 (La. 1981).

[19] LA. REV. STAT. § 37:1745.14.

although the defendants might have had an ethical obligation to disclose their knowledge of Dr. Berry's drug problems, they were also rightly concerned about a possible defamation claim if they communicated negative information about Dr. Berry.[20] As a general policy matter, even if an employer believes that its disclosure is protected because of the truth of the matter communicated, it would be burdensome to impose a duty on employers, upon receipt of a employment referral request, to investigate whether the negative information it has about an employee fits within the courts' description of which negative information must be disclosed to the future employer. Finally, concerns about protecting employee privacy weigh in favor of not mandating a potentially broad duty to disclose.

The Louisiana court in Louviere recognized that no court in Louisiana has imposed on an employer a duty to disclose information about a former employee to a future employer.[21] Furthermore, we have not found a single case outside of Louisiana where a court imposed an affirmative duty on an employer to disclose negative information about a former employee.[22] Some courts have held that employers have a legal duty to disclose negative information about former employees who later cause foreseeable physical harm in their new jobs, at least

---

[20] See Louviere v. Louviere, 839 So. 2d 57, 64 (La. Ct. App. 2002) ("[I]f a former employer gives negative information about an employee to a prospective employer, this can result in exposure to a defamation claim.").

[21] Id. at 62. The court also said that it did not believe that under Louisiana law there is a duty of a former employer to disclose information about a former employee. Id. We do not simply rely on this statement alone because we must follow the Louisiana Supreme Court and engage in a careful case specific analysis, guided by the policy considerations discussed by the Louisiana Supreme Court, to determine whether there was a duty to disclose under the facts here. We also note that the Louviere court itself engaged in an intensive fact analysis to see if there was liability. Id. at 62–67.

[22] Louisiana courts look to other jurisdictions for help when deciding legal duty questions. Posecai v. Wal-Mart Stores, Inc., 752 So. 2d 762, 766 (La. 1999).

15

when there are misleading statements made by the former employer.[23] But each of these cases based its conclusion on the fact that the former employer had made affirmative misrepresentations in its referral, and none imposed a duty based on the employer's mere nondisclosure.[24] These cases reinforce our conclusion that the defendants had a duty to avoid misleading statements in their referral letters, but they do not support plaintiffs' duty to disclose theory. In fact, one court explicitly held that a hospital did not have an affirmative duty to disclose a nurse's past sexual misconduct toward patients when asked for an evaluation by a prospective employer, but that "[the defendant did] not challenge the proposition that, in undertaking to provide . . . a reference, and in volunteering information about [the employee's] qualities as a nurse, it incurred a duty to use reasonable care to avoid disclosing factually misleading information."[25]

### 3. Legal Cause

LAA contends that even if it breached a legal duty to Kadlec, the plaintiffs' claims fail for lack of legal causation. LAA argues that legal cause is not met here because Kadlec's and Dr. Berry's intervening negligence precludes concluding that it is a legal cause of plaintiffs' injuries. Because legal cause is

---

[23] See, e.g., Gutzan v. Altair Airlines, Inc., 766 F.2d 135, 137 (3d Cir. 1985); Randi W. v. Muroc Joint Unified Sch. Dist., 929 P.2d 582 (Cal. 1997); Davis v. Bd. of County Commr's of Doña Ana County, 987 P.2d 1172 (N.M. Ct. App. 1999).

[24] Gutzan, 766 F.2d at 139, 140–41; Randi W., 929 P.2d at 591–93 ("[H]aving volunteered . . . information, defendants were obliged to complete the picture by disclosing material facts regarding charges and complaints of [the employee's] sexual improprieties."); Davis, 987 P.2d at 1177–80.

[25] Grozdanich v. Leisure Hills Health Ctr., Inc., 25 F. Supp. 2d 953, 989–90 (D. Minn. 1998). The court continued: "It is well-settled that, even if one has no duty to disclose a particular fact, if one chooses to speak he must say enough to prevent the words from misleading the other party." Id. at 990 (internal quotation marks omitted).

16

a legal question under Louisiana law,[26] we review the district court's conclusion as to legal cause de novo.[27]

The leading case on legal cause in Louisiana is Roberts v. Benoit.[28] There, the Louisiana Supreme Court held that "[t]he critical test in Louisiana . . . is phrased in terms of 'the ease of association' which melds policy and foreseeability into one inquiry: Is the harm which befell the plaintiff easily associated with the type of conduct engaged in by the defendant?"[29] Under Louisiana law, and with the jury's factual findings in mind,[30] the LAA defendants' actions and omissions were a legal cause of Kadlec's liability. Following the Louisiana Supreme Court, we ask ourselves whether the harm to plaintiffs is easily associated with the type of conduct engaged in by the defendant. Here, Dr. Dennis and Dr. Preau gave Dr. Berry favorable recommendations, when they knew that Dr. Berry had used narcotic drugs while on duty at a hospital. LAA even fired Dr. Berry for cause for "report[ing] to work in an impaired physical, mental, and emotional state, which prevented [him] from properly performing [his] duties and put[] [his] patients at significant risk." The harm to Jones and the harm to plaintiffs that resulted from the LAA defendants' breaches are "easily associated" with Kadlec's liability. In fact, harm stemming from Dr. Berry's use of narcotic drugs

---

[26] Todd v. State Through Dep't of Soc. Servs., 699 So. 2d 35, 39 (La. 1997).

[27] In re Liljeberg Enterprises, Inc., 304 F.3d 410, 423 (5th Cir. 2002).

[28] 605 So. 2d 1032 (La. 1992).

[29] Id. at 1054.

[30] This court reviews legal conclusions independently, but reviews findings of fact, as well as mixed questions of law and fact, under the less stringent clear error standard. In re Liljeberg Enterprises, 304 F.3d at 423–24. We review the legal causation question independently. But we must consider the facts relevant to our legal cause analysis consistent with the jury's verdict.

17

while on-duty is the type of harm we would expect.

The LAA defendants' argument that the intervening negligence of Dr. Berry and Kadlec absolves them of liability is not accepted. Roberts held that "[i]t is well settled in Louisiana law that an intervening act does not automatically absolve a prior negligent party from liability."[31] Whether an intervening act absolves a prior negligent actor from liability depends on the foreseeability of the act from the perspective of the original tortfeasor and whether the intervening act is "easily associated" with the risk of harm brought about by the breach of the original duty.[32] Dr. Berry's hiring and his subsequent negligent use of narcotics while on-duty was foreseeable and "easily associated" with the LAA defendants' actions. He had used narcotics while on-duty in the past, and the LAA defendants could foresee that he would do so again if they misled a future employer about his drug problem.

The LAA defendants focus on Kadlec's negligence and claim that it was a superseding cause of plaintiffs' injuries. They argue that Kadlec had multiple warning signs that Dr. Berry was using drugs, and had it responded with an investigation, plaintiffs' injuries would have been avoided. The LAA defendants focus on Dr. Berry's erratic behavior after his return from Montana, his over-anesthetization of a patient in September 2002, and the signs that he was ill on the day of Jones's surgery. The jury found that Kadlec's own negligence was a cause of plaintiffs' financial injury. But this does not relieve the defendants of liability. The jury also reasonably concluded that the LAA defendants negligently and intentionally misled Kadlec about Dr. Berry's drug addiction.

---

[31] 605 So. 2d at 1055.

[32] Id. at 1055–56 (citing Jones v. Robbins, 289 So. 2d 104 (La. 1974) and LeJeune v. Allstate Ins. Co., 365 So. 2d 471 (La. 1978)).

18

By intentionally covering up Dr. Berry's drug addiction in communications with a future employer, they should have foreseen that the future employer might miss the warning signs of Dr. Berry's addiction. This was within the scope of the risk they took.

Indeed, both plaintiffs' and defendants' witnesses agreed at trial that narcotics addiction is a disease, that addicts try to hide their disease from their co-workers, and that particularly in the case of narcotics-addicted anesthesiologists, for whom livelihood and drug supply are in the same place, colleagues may be the last to know about their addiction and impairment. This is not a case where a future tortious act is so unforeseeable that it should relieve the earlier tortfeasor of liability. In fact, this case illustrates why the comparative fault system was developed—so, as here, multiple actors can share fault for an injury based on their respective degrees of responsibility.[33]

### 4. Tort Indemnity and Contribution

Defendants claim that the district court should have dismissed this action because Louisiana does not allow contribution or indemnity claims, and this suit, properly characterized, is one for contribution or indemnity. The defendants have not provided this court with any relevant legal authority for the proposition that this is a contribution or indemnity suit in disguise. Moreover, defendants' argument fails because plaintiffs sued based on the theory that Lakeview Medical and the LAA defendants breached a duty to Kadlec by making intentional and negligent misrepresentations about Dr. Berry in the referral letters supplied to Kadlec. As a result of these misrepresentations, plaintiffs

---

[33] See Mendoza v. Mashburn, 747 So. 2d 1159, 1168, 1173 (La. Ct. App. 1999) (holding that "[a]n initial tortfeaser will not be relieved of the consequences of his negligence unless the intervening cause superceded the original negligence and alone produced the injury," and reinstating a jury's findings of comparative fault).

suffered a foreseeable financial injury in excess of $8 million. This is not a lawsuit asking for contribution or indemnity. It is a lawsuit that alleges breaches of duties owed to Kadlec. Therefore, defendants' argument is rejected.

We are not convinced by defendants' other challenges to plaintiffs' intentional and negligent misrepresentation claims. In particular, LAA complains that there was insufficient evidence that Kadlec reasonably relied on the letters from Dr. Preau and Dr. Dennis. We disagree.

## B. Evidence of Western's Reinsurance

The defendants argue that the district court erred when it granted plaintiffs in limine request under the collateral source rule to exclude evidence of Western's reinsurance. After Western expended $744,000 on litigation costs and settled the Jones lawsuit against Kadlec for $7.5 million, it received payment for a portion of its expenditures from its reinsurers. The defendants sought unsuccessfully to introduce this reinsurance information to the jury. We review the district court's evidentiary ruling for an abuse of discretion.[34]

As adopted by the Louisiana Supreme Court, the collateral source rule is a rule of evidence and damages. The rule provides that payments made to or benefits conferred upon an injured party from sources other than the tortfeasor, notwithstanding that such payments or benefits cover all or a part of the harm for which the tortfeasor is liable, are not credited against the tortfeasor's liability.[35] The policy driving the rule is the belief that a tortfeasor should not benefit because a plaintiff had the foresight to obtain insurance.[36] Here,

---

[34] United States v. Sumlin, 489 F.3d 683, 688 (5th Cir. 2007).

[35] See Bozeman v. State, 879 So. 2d 692, 697 (La. 2004) (noting that the common law collateral source rule has its source in the Restatement of Torts and that it has been embraced by Louisiana courts).

[36] Id. at 698.

20

although the plaintiffs incurred damages in excess of $8 million as a result of defendants' torts (and Dr. Berry's and Kadlec's own tortious behavior, which the jury considered), defendants wanted to introduce evidence of Western's reinsurance to show plaintiffs' "real injury." But this is nothing more than a classic argument against the collateral source rule, and it would effectively penalize Western for having the foresight to obtain reinsurance. While there are exceptions to the collateral source rule that allow a party to introduce evidence of reinsurance,[37] they are inapplicable here.

### C. Plaintiffs' Attorney's Fees in the Jones Litigation

The district court denied defendants' motion in limine to keep from the jury evidence of the money plaintiffs were forced to spend to defend the Jones's lawsuit. The jury verdict included these costs and attorney's fees. Defendants argue that plaintiffs should not have been allowed to recover attorney's fees spent defending the underling lawsuit. We review this evidentiary ruling for an abuse of discretion.[38]

We hold that the district court properly denied defendants' motion. While there is no Louisiana case directly on point, this conclusion is consistent with the rule found in Section 914(2) of the Second Restatement of Torts:

> One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for

---

[37] For example, in Am. Fidelity & Cas. Co. v. Greyhound Corp., 258 F.2d 709 (5th Cir. 1958), we held that evidence of reinsurance was admissible to show an insurer's good faith in settling or not settling underlying litigation against its insured for a certain amount. Defendants' reliance on American Fidelity is misplaced because that case was about whether the insurer showed bad faith in choosing whether or not to settle the underlying lawsuit because of its reinsurance limits. Id. at 712. By contrast, the defendants want to introduce evidence of Western's reinsurance to show plaintiffs' "real injury," i.e., the amount that defendants' tortious activities truly harmed plaintiffs.

[38] Sumlin, 489 F.3d at 688.

21

loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action.

Plaintiffs, due to the torts of the defendants, were required to expend costs and attorney's fees defending the Jones lawsuit. They also had to pay to settle the Jones action. In this lawsuit, plaintiffs proved that defendants were legally responsible for their financial damages, which included costs and attorney's fees. Under the jury's apportionment of fault, the defendants appropriately were required to pay for a portion, but not all, of these costs and attorney's fees.

Defendants argue that this case is governed by Sea-Land Service, Inc. v. Crescent Towing & Salvage Co.[39] In Sea-Land, we held in a contribution action that the plaintiffs could not recover attorney's fees expended defending the underlying suit.[40] We have already held that this suit is not a contribution action, but rather a lawsuit claiming that defendants breached independent duties owed to Kadlec; therefore, Sea-Land is inapposite.

### D. Negligent Monitoring and Investigation

In its lone point on cross-appeal, the plaintiffs contend that the district court erred when it dismissed their claim against the defendants for negligent monitoring and investigation.[41] Plaintiffs argue that their complaint stated a claim under general Louisiana negligence law, while the district court mistakenly viewed the complaint as only asking the court to impose a duty under the Health Care Quality Improvement Act (HCQIA) and certain Louisiana regulations. We agree with the district court that the complaint states a claim

---

[39] 42 F.3d 960 (5th Cir. 1995).

[40] Id. at 963.

[41] Because this was the only claim against Drs. Parr and Baldone, dismissal of this claim led the district court to dismiss them from the suit with prejudice. These doctors are, however, shareholders of LAA.

22

based only on alleged duties under the HCQIA and Louisiana regulations. In any case, to the extent that plaintiffs alleged a claim under general Louisiana negligence law, the district court considered this argument in a motion to reconsider and correctly concluded that this claim should be dismissed because any duty the law imposes does not reach these plaintiffs.

E. Summary and Remand Instructions

The district court properly instructed the jury to find for the plaintiffs on their intentional and negligent misrepresentation claims if the jury concluded that the defendants' letters to Kadlec were intentionally and negligently misleading in a manner that caused injury to the plaintiffs. But the district court's instructions also improperly enabled the jury to find for the plaintiffs on these claims if the defendants intentionally and negligently did not disclose their knowledge of Dr. Berry's drug problems, irrespective of whether the letters to Kadlec were false or misleading. Because the verdict form only inquired as to whether the plaintiffs' claims for intentional and negligent misrepresentation, in separate interrogatories, were met as to each defendant, but did not request special findings of fact as to each of the separate possible theories, we cannot know whether the jury's verdict was based on the proper or improper theory. But the fact that the jury instructions stated both a valid and invalid theory of recovery for plaintiffs' claims does not require a new trial because the error here was harmless. The letters from Dr. Dennis and Dr. Preau were false on their face and patently misleading. There is no question about the purpose or effect of the letters. Because no reasonable juror could find otherwise, we uphold the finding of liability against Dr. Dennis and Dr. Preau.[42] But because Lakeview

---

[42] See Carbalan v. Vaughn, 760 F.2d 662, 665 (5th Cir. 1985) ("Because a verdict for [the plaintiff] against the [defendant] would have been impermissible as a matter of law, any error in the jury charge on . . . liability was harmless.").

Medical's letter was not materially misleading, and because the hospital did not have a legal duty to disclose its investigation of Dr. Berry and its knowledge of his drug problems, the judgment against Lakeview Medical must be reversed.

The district court entered judgment consistent with how the jury allocated fault among the entities it found to be legally responsible for the plaintiffs' injuries. The jury's allocation was as follows: Dr. Dennis 20%; Dr. Preau 5%; Lakeview Medical 25%; Kadlec 17%; and Dr. Berry 33%. We have affirmed the liability finding of the jury against the LAA defendants. But now that we have reversed the judgment against Lakeview Medical, the question arises whether there must be a reapportionment of fault with a corresponding change to damages assessed against the LAA defendants. It is possible that this is unnecessary, if under Louisiana law we can simply compare the fault percentages of the remaining parties. But Louisiana law might also require a reapportionment of fault and, therefore, a fresh determination of damages. Because there was no briefing on this issue, we vacate the judgment against the LAA defendants and remand the case to the district court to determine what, if anything, needs to be redone on the apportionment and damages issues, and then to enter judgment against the LAA defendants accordingly.

## IV. Conclusion

The judgment of the district court is REVERSED in part, VACATED in part, and REMANDED for proceedings consistent with this opinion.

24